UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| VICTOR MURILLO BARAHONA,<br><br>Petitioner,<br><br>v.<br><br>THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, et al.,<br><br>Respondents. | Civil Action No. 19-200 (CCC)<br><br>OPINION |

**CECCHI, District Judge**:

Presently before the Court is the petition for a writ of habeas corpus of Victor Murillo Barahona ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court convictions. (ECF No. 1). Respondents filed a response to the petition (ECF No. 13), to which Petitioner has replied. (ECF No. 17). For the following reasons, the Court denies Petitioner's habeas petition, and denies Petitioner a certificate of appealability.

**I. BACKGROUND**

The New Jersey Superior Court Appellate Division summarized the factual background of this matter as follows in its opinion affirming Petitioner's conviction:

> According to the evidence the State presented at trial, when [Petitioner] married Zelda[1] in 2000[,] she had two children and four grandchildren. Her daughter, Elizabeth, had two daughters, Emily and Ellie. Her son and his wife, Madeline, had two daughters, Makayla and Maria. The families lived in the same house.
>
> On April 14, 2008, Madeline took Makayla and Maria to the doctor to get physical examinations for school. Makayla was eleven years

---

[1] The Appellate Division used pseudonyms for Petitioner's family members and the names of his victims. Given the sealing of this matter and the interests involved, this Court will use the same pseudonyms throughout this Opinion.

old. Maria was eight. After the visit, while Madeline was discussing some health concerns with Makayla, Madeline cautioned Makayla, "don't let anybody touch you." From Makayla's reaction, Madeline suspected "something had happened or was happening" because Makayla suddenly became quiet and averted her gaze. Madeline asked Makayla if [Petitioner] had touched her. Makayla replied, "if I tell you[,] you are going to be mad. It's a secret between [Emily, Ellie] and I." After Madeline assured Makayla for "about a half hour" that she would not be mad, Makayla disclosed that [Petitioner] first groped her when she was in kindergarten. Makayla later disclosed that [Petitioner] once tried to make her watch a video of him and Emily having sex, but she ran away.

Later that day, Madeline questioned her other daughter, Maria, as well as her nieces, Emily and Ellie. She learned that [Petitioner] had first abused Maria when she was in second grade. She also learned that [Petitioner] was still abusing her nieces, who were then ages fourteen and eleven. Ellie said [Petitioner] liked to bite and showed Madeline a bite mark [Petitioner] had made on her breast.

Madeline notified the police, who took the children to the Union County Child Advocacy Center where they were interviewed by Janet Lopez, a detective assigned to the Child Abuse Unit in the Union County Prosecutor's Office. Detective Lopez took a typewritten statement from Emily and videotaped interviews with Ellie, Makayla, and Maria. In their statements, the children described how [Petitioner] had sexually molested them, by holding them down, by groping them, by committing acts of penetration, allegations they also recounted for the jury. After interviewing the victims, Detective Lopez obtained a warrant for [Petitioner]'s arrest.

The police arrested [Petitioner] the next day, April 15, 2008, and transported him to the municipal police department where Detective Lopez and Sofia Santos, another detective employed by the Union County Prosecutor's Office, questioned him after advising him of his *Miranda* rights. After initially denying the accusations, [Petitioner] confessed to committing sexual acts with all of the girls. He began abusing two of the children when they were eight years old, and two of them when they were ten. [Petitioner] also admitted that he recorded himself and Emily having sex on two occasions. The police obtained a warrant and seized two DVDs from [Petitioner]'s bedroom. Emily identified herself and [Petitioner] as the two people in the DVDs having sex.

At the time of [Petitioner]'s trial, Emily was fifteen years old, Ellie was twelve, Makayla was twelve, and Maria was nine. In addition

to testifying about how [Petitioner] abused them, each testified to her age, birthdate, and her approximate age when the crimes occurred. Their mothers also testified to their ages and dates of birth, and the State introduced [Petitioner]'s confession, in which he admitted to abusing the children before their thirteenth birthdays.

Following [Petitioner]'s arrest, a Union County Grand Jury returned a twenty-two count indictment and charged him: for his offenses against Emily, with two counts of first-degree aggravated sexual assault; [in violation of N.J. Stat. Ann. §] 2C:14-2a(1) and -2a(2)(a) (counts one and four), three counts of second-degree sexual assault, [in violation of N.J. Stat. Ann. §] 2C:14-2b and -2c(4) (counts two, five and six), two counts of third-degree endangering the welfare of a child, [in violation of N.J. Stat. Ann. §] 2C:24-4a (counts three and seven), and one count of second-degree endangering the welfare of a child, [in violation of N.J. Stat. Ann. §] 2C:24-4b(3) (count eight); for his offenses against Maria, with first-degree aggravated sexual assault, [in violation of N.J. Stat. Ann. §] 2C:14-2a(1) (count nine), second-degree sexual assault, [in violation of N.J. Stat. Ann. §] 2C:14-b (count ten, and third-degree endangering the welfare of a child [in violation of N.J. Stat. Ann. §] 2C:24-4a (count eleven); for his offenses against Makayla, with first-degree aggravated sexual assault, [in violation of N.J. Stat. Ann. §] 2C:14-2a(1) (count twelve), second-degree sexual assault, [in violation of N.J. Stat. Ann. §] 2C:14-2b (count thirteen, third-degree endangering the welfare of a child, [in violation of N.J. Stat. Ann. §] 2C:24-4a (count fourteen), second-degree attempted sexual assault, [in violation of N.J. Stat. Ann. §] 2C:5-1a(3) and 2C:14-2b (count fifteen, and third-degree attempted endangering the welfare of a child, [in violation of N.J. Stat. Ann. §] 2C:5-1a(3) and 2C:24-4a (count fifteen); and for his offenses against Ellie, with first-degree aggravated sexual assault, [in violation of N.J. Stat. Ann. §] 2C:14-2a(1) (count seventeen), three counts of second-degree sexual assault, [in violation of N.J. Stat. Ann. §] 2C:14-2b (counts eighteen, twenty, and twenty-one), and two counts of third-degree endangering the welfare of a child, [in violation of N.J. Stat. Ann. §] 2C:24-4a (counts nineteen and twenty-two).

The parties filed numerous pre-trial motions, one of which was [Petitioner]'s motion to suppress his confession, which the trial court denied. At trial, the State dismissed counts six and twenty-one of the indictment after presenting its case. The jury convicted [Petitioner] on the remaining twenty counts.

The court subsequently sentenced [Petitioner] on counts one, nine, twelve, and seventeen to four consecutive eighteen-year prison

terms, subject to NERA; on count four, to a concurrent fifteen-year prison term; and on count eight, to a consecutive seven-year prison term. The court merged the remaining counts, imposed appropriate assessments and fines, and ordered [Petitioner] to serve parole supervision for life upon his release.

. . . .

According to Detective Lopez's testimony at the suppression hearing, she and Detective Santos interviewed [Petitioner] in Spanish. He did not understand English. [Petitioner] not only understood Spanish, but he explicitly informed the detectives that he knew how to read Spanish. Detective Santos read [Petitioner] his *Miranda* rights in Spanish and also gave [Petitioner] a *Miranda* rights form, which [Petitioner] read and initialed. The final part of the form consisted of a "waiver of rights" which [Petitioner] read. He asked about the word "pressure" or "coercion," and Detective Lopes explained what they meant. When [Petitioner] said he could not afford an attorney but could call some friends, Detective Lopez said he could do that, but that if he could not afford an attorney one would be assigned to him. [Petitioner] said he understood and signed the waiver.

[During Petitioner's *Miranda* warnings, the following exchange occurred which forms the basis of Petitioner's chief *Miranda* claim:]

> [Detective Santos:] Okay, cualquier cosa que usted diga puede ser y sera' usado en contra suya en el tribunal. (Okay, anything you say can and will be used against you in a court of law."
>
> [Detective Lopez:] O ante de la corte. (Or before the court.)
>
> [Detective Santos:] That doesn't [sound] right do we have ours? Tiene el derecho . . . usted entiende ese derecho? (You have the right . . . do you understand that right?)
>
> [Petitioner:] (Nodding yes).
>
> [Detective Santos:] Cualquier cosa que usted diga puede ser y sera' usado en contra suya antes de en tribunal. Cualquier cosa que usted diga a nosotros aqui' puede ser usado contra used en el corte. Usted entiende ese derecho? (Anything you say can and

4

>
> will be used against you in a court of law.  Anything you say to us here may be used against you in court.)
>
> [Petitioner:] O a favor Tambien.  (or also in favor.)
>
> [Detective Santos:] Huh?
>
> [Detective Lopez:] O a favor si.  (Or in favor, yes.)
> Or in favor, yes.
>
> [Petitioner:] Eso.  (Right.)
>
> [Detective Santos:] Entiende ese derecho?  (Do you understand that right?)
>
> [Petitioner:] Si, si.  (Yes, yes.)

ECF No. 3-13 at 1-9.

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  The petitioner has the burden of establishing that he is entitled to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 567 U.S. 37, 40–41 (2012).  Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

5

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation omitted). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B. Analysis

### 1. Petitioner's *Miranda* claim

In his chief claim, Petitioner contends that the *Miranda* warnings he was given deviated from the proper form of the required warnings by including the suggestion that Petitioner's statement could be used in his favor at trial. ECF No. 1 at 2, 4. As such, the warnings given were fatally flawed and his statement should have been suppressed. *Id.* The Appellate Division rejected this contention, finding that Petitioner was directly informed both through the written *Miranda* form and the spoken warnings that anything he said could be used against him at trial. *See* ECF No. 13-3 at 11-12. The Appellate Division also found that it was Petitioner himself who introduced the idea (with which the detectives agreed) that any statement could also be used in his favor, and that Petitioner had received the full substance of the required warning. *Id.*

Numerous courts have held that "[i]t is misleading to tell a person in custody, as part of the Miranda warnings, that anything he says can be used *for* him in a court of law." *State v. Melvin*, 65 N.J. 1, 13 (1974) (emphasis added); *see Quinn v. State*, 183 N.W.2d 64 (Wis. 1971); *Commonwealth v. Singleton*, 266 A.2d 753, 756 (Pa.1970) (Bell, C.J., concurring and dissenting). However, courts generally do not hold that these warnings are unconstitutional.

"In resolving these questions of the adequacy of the warning we should give precedence to substance over form." *United States v. Lamia*, 429 F.2d 373, 376 (2d Cir. 1970) (citing *Tucker v. United States*, 375 F.2d 363 (8th Cir. 1967), *cert. denied*, 389 U.S. 888 (1967)). Although *Miranda* requires that all criminal defendants subject to custodial interrogation must be provided certain warnings, the Court has never required a specific, talismanic formulation of the four proscribed warnings by interrogating officers. *See Florida v. Powell*, 559 U.S. 50, 59–61 (2010). All that *Miranda* requires is that a suspect exposed to custodial interrogation be warned prior to questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to an attorney, and that an attorney will be appointed prior to questioning if he so desires. *Id.* at 59–60. As the Supreme Court explained in *Powell*,

> The four warnings *Miranda* requires are invariable, but this Court has not dictated the words in which the essential information must be conveyed. *See California v. Prysock*, 453 U.S. 355, 359 [(1981)] (per curiam) ("This Court has never indicated that the rigidity of *Miranda* extends to the precise formulation of the warnings given a criminal defendant." (internal quotation marks omitted)); *Rhode Island v. Innis*, 446 U.S. 291, 297 [(1980)] (safeguards against self-incrimination include "*Miranda* warnings . . . or their equivalent"). In determining whether police officers adequately conveyed the four warnings, we have said, reviewing courts are not required to examine the words employed "as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth* [*v. Eagan*,] 492 U.S. [195,] 203 [(1989)].

7

*Id.*. Thus, so long as the warnings given reasonably convey the meaning of the four required warnings, they will comply with the requirements of *Miranda* even if they deviate from the "standard" form of the warnings.

Here, Petitioner both read and was given the *Miranda* warnings in essentially their standard form, albeit in Spanish. He both initialed and signed the *Miranda* form indicating his understanding and told the detectives that he understood those warnings. Although he was initially advised that his statements could be used against him in court, Petitioner was later told that the statement could be used either "for or against" him. However, this occurred only after Petitioner, and not the detectives, suggested that he could use the statement in his favor at trial. Petitioner was clearly advised of his rights, and was clearly told that any statement he gave could be used against him in a court of law. When considered in their totality, the detectives (and Spanish-language *Miranda* form) clearly conveyed the four *Miranda* warnings, notwithstanding Petitioner was also verbally informed that his words could be used *for* or against him. Accordingly, the Appellate Division's denial of relief on this claim was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Thus, Petitioner is not entitled to habeas relief on this basis.

**2. Petitioner's Jury Instruction and Verdict Sheet Claim**

Petitioner next contends that he was denied due process because the trial judge informed the jury of the birthdate, and therefore the age, of each of his victims both during his jury instructions and on the verdict sheet provided to the jury during deliberations. ECF No. 1 at 2, 5-7. Petitioner contends that this amounts to the judge "directing" a verdict as to one of the essential elements of some of his sexual abuse charges—the ages of his victims. The Appellate Division rejected this claim on direct appeal, finding that any error in including their birthdates on the

8

verdict sheet and in the jury charge was harmless, as all of the victims testified as to their ages during the abuse.  Moreover, at the time of their testimony, all but one victim was still less than thirteen years old and the last was less than fifteen—thus, at trial, each victim remained under the relevant age threshold for the crimes for which Petitioner was tried.[2]  Finally, the children's mothers also testified as to their ages. ECF No. 13-3 at 13.  The Appellate Division therefore rejected Petitioner's claim as it was "simply implausible" that the jury had not already noticed the ages of the girls.

In a habeas proceeding, even errors of a constitutional dimension will be considered harmless unless the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).  Here, even assuming *arguendo* that including the girls' birthdates on the verdict sheet and in the jury charge amounted to error, any such error was harmless.  As the Appellate Division noted, the jury had been informed of the girls ages multiple times throughout the course of the trial and had been told both the girls' ages at the time of trial and when the abuse occurred.  Indeed, in his admitted statement, Petitioner admitted to abusing the girls when they were below the relevant statutory thresholds.  Given this repeated information, the jury was clearly aware of the girls' ages at the relevant times, and any error arising out of re-informing the jury of the girls' birthdates had no substantial or injurious effect on the verdict.  As an error related to disclosing the ages of the victims was clearly harmless, Petitioner is not entitled to habeas relief on this claim.

---

[2] As the Appellate Division noted, Petitioner was charged with committing proscribed acts with the three younger girls when they were less than thirteen years old, and was charged with committing proscribed acts against the older girl when she was between thirteen and sixteen. Petitioner was also charged with endangering all of the girls when they were under sixteen. Thus, even at the time of trial, each girl was under the relevant statutory threshold.

### 3. Petitioner's ineffective assistance of counsel claims

In his remaining claims for relief, Petitioner asserts that he received ineffective assistance of trial and appellate counsel. ECF No. 1 at 3, 8. The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a

> "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

In his ineffective assistance claim, Petitioner asserts that his trial counsel proved deficient in failing to call Petitioner to testify at the pretrial suppression hearing regarding the admissibility of Petitioner's confession. ECF No. 1 at 8-14. Had he been called, Petitioner asserts, he would have testified that he only confessed because he was scared when taken into custody, was then subjected to verbal abuse from the detectives in the form of "scream[ed]" assertions that the police already had evidence of his guilt, and he therefore waived his rights and confessed merely to free himself from this berating.

The Post-Conviction Relief ("PCR") court and Appellate Division held that a video of Petitioner's statement refuted this argument. Specifically, the video showed that the detectives calmly discussed the *Miranda* warnings with Petitioner for "nineteen minutes," answered all of his questions as to the warnings without accusation or warning, and did not otherwise subject Petitioner to coercive beratement during the recorded interview.[3] Petitioner, the PCR courts concluded, was thus not prejudiced by the failure of counsel to call him at the suppression hearing.

---

[3] This also contradicts Petitioner's argument, made for the first time in reply, that the brutality of police in Honduras, where he lived from birth in 1955 to 2001, conditioned him to fear police. ECF No. 17 at 8. While courts do consider a petitioner's personal characteristics, including age, education, intelligence and prior experience with the police, in determining whether a confession was voluntary, *Holland v. McGinnis*, 963 F.2d 1044, 1052 (7th Cir. 1992), Petitioner does not

11

Having reviewed the record of this matter, the PCR court and Appellate Division's decision do not contain an unreasonable evaluation of the facts of this matter. Accordingly, this Court finds that the PCR courts did not contradict or unreasonably apply applicable federal law. *See United States v. Perez-Hinojosa*, No. 98-50617, 1999 WL 716586 (Table), at *1 (9th Cir. 1999) (holding that screaming and "prey[ing] on maternal instincts by threatening ten years" imprisonment and the loss of the petitioner's children was not improper coercion); *United States v. Rang*, No. 15-cr-10037, 2017 WL 74278, at *7 (D. Mass. Jan. 6, 2017), *aff'd*, 919 F.3d 113 (1st Cir. 2019) ("Although the interrogating officer yelled at the suspect a few times, the court did not deem this to rise to the level of coercion."). As the PCR court and Appellate Division noted, even had Petitioner successfully suppressed his recorded statement, the record still contains overwhelming evidence of his guilt, including the testimony of all four victims, their mothers, and the video recording of Petitioner abusing one of the four victims. Accordingly, Petitioner is not entitled to habeas relief on this claim.

In his next series of claims, Petitioner argues that his trial attorney failed to prepare him to testify at trial, ultimately leading to him not testify in his own defense. Petitioner contends that testifying in his defense would have permitted him to interject testimony regarding his state of mind into the criminal proceedings. Petitioner also asserts that this failure led to him not being able to present a defense on his own behalf. The PCR court rejected these claims. The court found that Petitioner had knowingly waived his right to testify and to put on further defense witnesses

---

specify any *personal* experience with police brutality which would support his argument. More importantly, there are no objective indications of coercion. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). Moreover, when he was questioned in 2008, he had already been in the United States for about seven years.

during colloquies on the record with the trial court and defense counsel after the State rested. Further, the PCR court found that Petitioner could not show prejudice because any proposed testimony had no reasonable likelihood of altering the outcome of the proceedings in light of the overwhelming evidence of Petitioner's guilt, including his confession, the testimony of all four victims and their families, and the video recording of Petitioner's abuse of one of the victims

Having reviewed the record, this Court finds that the state court decisions on these issues were neither contrary to nor an unreasonable application of federal law. Moreover, they did not involve an unreasonable application of the facts to Petitioner's case. Following the State's decision to rest at trial, the trial court engaged in a colloquy with Petitioner. After allowing Petitioner to discuss the matter with counsel, Petitioner specifically confirmed with the trial judge that he understood that it was his right, and his right alone, to decide whether to testify, that counsel had discussed the issue with him, and that after discussing the issue with counsel to his satisfaction, he had elected not to testify. *See* ECF No. 13-3 at 61–64. In a further colloquy, Petitioner confirmed that he had conferred with counsel and concurred that they should not put on additional defense witnesses and should instead rely on putting the State to its proofs, that he was satisfied with counsel's advice in this regard, and that he had had no communication problems or issues understanding counsel throughout trial. *Id.* at 73–74. The record thus contradicts Petitioner's assertion—if Petitioner, as he now asserts, "deeply" desired to testify, he had ample opportunity to inform the trial court. He did not, and instead disclaimed any desire to testify.

Even were this not the case, the ultimate flaw in Petitioner's argument is the overwhelming evidence of his guilt presented at trial, including the testimony of multiple witnesses, a video recording clearly evidencing Petitioner's guilt as to at least one victim, and Petitioner's own confession. Simply put, there is no reasonable likelihood that the outcome of Petitioner's trial

13

would have been any different had he testified. Petitioner therefore could not possibly show *Strickland* prejudice, and his ineffective assistance of counsel claims must fail as a result.

  Petitioner next asserts that he suffered ineffective assistance of appellate counsel during his direct appeal. Petitioner argues that, had counsel raised every present claim which could have been raised on direct appeal, he would have received a new trial. ECF No. 1 at 14. While appellate counsel's decisions are subject to the same ineffective assistance standard applicable to trial counsel claims, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000), it is well-established "that counsel decides which issues to pursue on appeal." *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996). Thus, appellate counsel need not raise every nonfrivolous claim a defendant wishes to pursue. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). As the chief component of effective appellate advocacy is the winnowing out of weaker claims in favor of those with a greater chance of success, *id.* at 753; *Smith v. Murray*, 477 U.S. 527, 536 (1986), the Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *See Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). As such, counsel cannot be constitutionally ineffective for failing or refusing to raise a meritless claim. *Wets v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000). Here, appellate counsel raised the only two claims which could clearly have been raised on direct appeal: Petitioner's jury instruction and *Miranda* claims, and those claims were rejected by the Appellate Division. Even if counsel had been able to raise Petitioner's other ineffective assistance claims on direct appeal, all of those claims are without merit for the reasons discussed above. As such, Petitioner cannot show he was prejudiced by appellate counsel's litigation decisions, and his ineffective assistance of appellate counsel claim must fail.

In his final ineffective assistance of counsel claim, Petitioner asserts that even if his individual claims do not warrant habeas relief, all of his claims, considered cumulatively, warrant a new trial as he believes his counsel was constitutionally defective throughout the entirety of his criminal proceedings. Although errors "that individually do not warrant habeas relief may do so when combined,"

> a cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (internal quotations and citations omitted), *cert. denied*, 552 U.S. 1108 (2008). Whether considered individually or in the aggregate, Petitioner has utterly failed to show that he suffered any prejudice from counsel's alleged deficiencies. The evidence of Petitioner's guilt was overwhelming, and even had counsel done all that Petitioner wishes, there is no reasonable likelihood that the outcome of his trial would have been different. Petitioner's claims thus fair no better in the aggregate than they do individually, and Petitioner's cumulative ineffective assistance claim is without merit.

Finally, Petitioner presents two addittional arguments in his habeas petition. First, he argues that he should receive an evidentiary hearing as to his claims. ECF No. 1 at 15. To obtain a hearing, "a movant must simply allege a set of facts that is not frivolous or clearly contradicted by the record and that demonstrates (if assumed to be true) that he would plausibly be entitled to relief under *Strickland*." *United States v. Arrington*, 13 F.4th 331, 335 (3d Cir. 2021), *cert. denied*, No. 21-7239, 2022 WL 892205 (U.S. Mar. 28, 2022). "A hearing is warranted where, for example,

15

resolution of the motion turns on credibility or disputed facts, or the record is inconclusive about whether a movant is entitled to relief. *Id.* (citing *United States v. Tolliver*, 800 F.3d 138, 142–43 (3d Cir. 2015) (remanding for a hearing because of factual disputes between the parties)). There are no such issues of credibility or disputed facts here; the record is sufficient to determine that Petitioner's claims lack merit.

Finally, Petitioner also argues that his claims should not be considered procedurally barred and his PCR petition should have been granted. ECF No. 1 at 16. But neither this Court nor the PCR court procedurally barred any of Petitioner's claims, and Petitioner has ultimately failed to show that the denial of his PCR petition was contrary to or involved an unreasonable application of applicable federal law. Petitioner's habeas petition is therefore denied in its entirety.

## III.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final habeas order arising out of a state court judgment unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner's claims are all clearly without merit for the reasons discussed above, Petitioner has failed to make a substantial showing of the denial of a constitutional right, and he is denied a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's habeas petition (ECF No. 1) is denied, and Petitioner is denied a certificate of appealability. An appropriate order follows.

                                          s/ Claire C. Cecchi

Date: October 28, 2022                              **Claire C. Cecchi, U.S.D.J.**